The next case call is No. 122487, people ex rel. Schad, Diamond & Shedden, P.C. v. My Pillow, Inc., Agenda No. 14. Fellant, are you ready? Yes. You may proceed. May it please the Court. I am Stephen Diamond. I represent the relator of Fellant. My Pillow is a tax-scoff law that the Circuit Court found with reckless disregard. And as a result, the Circuit Court entered a judgment against My Pillow for almost $800,000 for its failure to collect use tax on Internet sales to Illinois. The appellate court affirmed liability and damages, yet reversed the award of attorney's fees to the relator for the work of its attorneys that took almost now seven years. There are three separate and independent reasons to reverse the appellate court, and all of those are based on the language of the False Claims Act. First, the legislature has provided in four separate attorney's fees provisions in the False Claims Act that the party that does the work is entitled to attorney's fees for the work of its own attorneys, whether it's the Attorney General's lawyers or the relator's lawyers. Second, the specific fee provision that's at issue here, Section 4D2, provides that the legislature intended that the relator shall receive fees for the work of its own attorneys. And third, as recognized in Scicchiti v. UBS, in the False Claims Act, the legislature directly answered the public policy issues that this court raised in Hammer v. Lentz, yet the appellate court disregarded Scicchiti entirely. Now, this is the first argument. There are four attorney's fees provisions in the False Claims Act that show the scheme that the legislature intended, and the language of those four fees provisions is virtually identical. There are two fee provisions for the relator and two fees provisions for the state, for the work of the Attorney General. And as this court held in Lamb v. Board of Education in 2002, sections of the same statute should be construed to produce a harmonious whole. And here, the harmonious whole is that the provisions show that the legislature intended that if the Attorney General does the work, it receives fees for the work of its lawyers. If the relator does the work, they are entitled to fees for the work of their own lawyers. Now, when Illinois enacted the False Claims Act in 1991, there were three fees provisions that it put in. Two of them related to the relator, and the first one was that when the state declines to intervene, such as the case here, that as this court noted in Scicchiti, the key TAM plaintiff is entitled to receive 25% of the proceeds plus reasonable attorney's fees and costs. The second fees provision related to the relator provided that if the state intervenes, the relator would also be entitled to attorney's fees for the work of its lawyers there. The third provision in the original enactment in 1991 provided that to encourage the state to intervene and proceed in key TAM actions, the state would receive attorney's fees for the work of the Attorney General's lawyers. And this language is virtually identical to the language related for the relator. And this provision leaves the General Assembly inserted, even though the state would already receive at least 75% of the proceeds of any key TAM action. Why doesn't the public policy considerations of Hamer apply in this case? The Hamer considerations do not apply for three reasons. The first Hamer concern was that there be, to avoid unnecessary litigation, that a party should seek legal advice before filing suit. That was in Hamer, because in a FOIA action like Hamer, there was no gatekeeper to avoid unnecessary litigation. But as Scicchiti noted, that even when the Attorney General declines to intervene, the Attorney General retains complete control of the litigation. And that the key TAM plaintiff may proceed only with the consent of the Attorney General and remains completely subordinate to the Attorney General at all times. Now here, as Scicchiti pointed out, the Attorney General is the independent counsel that Hamer wanted. But the AG's control here went far beyond Hamer, because Hamer just said, we want to make sure that there's a gatekeeper. But here, after the case was filed, the attorneys from the Special Litigation Bureau of the Attorney General, who handle all false claims actions, extended the seal period, investigated the claim, and authorized it to go forward. Then, the lawyers from the Special Litigation Bureau received a copy of every pleading, every memorandum, and every order in the court. A lawyer from the Special Litigation Bureau attended every deposition, and in fact, three lawyers from the Special Litigation Bureau attended the trial of this matter. Then, after the court made a finding of liability, and the issue of damages had to be resolved, the Special Litigation Bureau lawyers filed two memorandums and argued before the court as to the correct measure of damages. So, and they did this without seeking to intervene. So, what this shows is, when Scicchiti said the Attorney General has complete control, they sally forth and they exert that control whenever they want to. But beyond the specific facts of this case, Scicchiti recognized that the Attorney General's control is rooted in three statutory provisions. First, that they can intervene at the beginning and conduct a case, or they can intervene at any time. Secondly, they have the power to settle a case at any time. And third, at any time they can dismiss the case. So, what's wrong with the analysis by the appellate court that the relator has made a business out of filing these false claims as a party plaintiff? In fact, they noted that 600 such lawsuits have been filed. And they said that the prospect of earning fees seems to be, quote, a significant driver in the decision to file these cases by a relator. So, they found that the potential for abuse fee generation exists if attorney fees are awarded to a law firm that is both relator and attorney. What's wrong with that whole discussion and rationale? Well, the first thing that's wrong with it is this is what the legislator and legislature intended. They put in fees provisions to incentivize relators to bring these cases, to incentivize the Attorney General to do it. And beyond that, every case that the relator has brought, and there have been several hundred, the Attorney General has authorized the relator to continue with the case after conducting an investigation. So, the idea that there's some abuse here is controverted by the fact that the Attorney General has authorized every case that we filed to go forward. Then, subsequently, the Attorney General chose to dismiss or settle a number of cases, which is their power. And it shows that the False Claims Act is working as the statute intended. The benefit, too, of having the relator incentivized is the first few 25 or so cases we filed, the state intervened. After that, every case they've declined and said, go to it. We have lawyers working for us, not the relator's lawyers. The state will receive at least 70% of any recovery, and the state does not have to put out any legal effort. So, the statute works entirely as the legislature has intended. And not only have there been substantial recoveries by the relator here. I think we'd say in our brief at least $25 million, but I think beyond that is the prophylactic effect of that. The very first cases that we filed 16 years ago were against Target and Walmart, who had set up separate corporations to make internet sales. And we're not collecting any tax. So, the fact that our lawsuit precipitated a settlement with Target and Walmart, the largest retailers in the state, who then started collecting tax on their internet sales, shows the statute has worked exactly as it was intended to work. Is this a double recovery? It's not, Your Honor. And I think that's an important point, because as the legislature pointed out, they provide a set or a share of any recovery. That's the travel damages and the penalties goes to the state. The share goes to the relator. That's for the share there. And then the attorney's fees are entirely separate. And so the attorney's fees are being rewarded or awarded for the work of the attorneys. Whereas in Scachitti, this court recognized that an informant can receive its share of the recovery simply for filing a lawsuit. That's what Scachitti recognized. So it's not a double recovery. It's a recovery, a bounty, as Scachitti called it, for filing a suit. And the other thing is for the attorney's fees. And indeed, what's significant is that by the provisions in the state, fees provisions for the state, as I mentioned, the first fees provision provides that if they intervene, they get fees. Then in 2010, the legislature amended the False Claims Act to provide that the state would also receive fees if they initiate a lawsuit under the False Claims Act. So under that situation, the state, because there's no relator, the state will receive 100% of the recovery plus attorney's fees. Yet there's no suggestion, and there should not be, that the state is getting an improper double recovery because it gets attorney's fees and it gets 100% of the recovery because that's what the legislature intended. And as this court has repeatedly said, the purpose is to understand the legislative intent and apply it. Here, the legislature set forth in great detail in the False Claims Act exactly how it should work. And it's the public policy set by the legislature. Whereas in Hammer v. Lentz, there was no legislative guidance. So this court drew upon its sense of public policy. But those public policy questions are all answered by the text of the False Claims Act. And I think an additional point that I want to elaborate on was, in Scicchiti, this court remarked that the Illinois False Claims Act closely mirrors the federal act. And that's true. But when it comes to fee provisions, the Illinois legislature made a sea change. And that was, as I mentioned, in 1991, they provided that the state intervenes, the state's entitled to attorney's fees for the work of its lawyers. Totally different from the federal act. Because the federal act provides no attorney's fees for the government under any circumstances. So the legislature made their decision in 1991. We want to encourage these actions. And the way we're going to do that is not only attorney's fees to our lawyer, but attorney's fees to the state for the work of the attorney general. That was the major change in 1991. Then, in 2010, the legislature came back and, at the behest of the attorney general, added this additional provision that, if the attorney general initiates an action, the attorney general would be entitled to fees for the work of its lawyers, as well as 100% of the recovery. So there's an entirely different statutory scheme here than in the federal act. And it reflects the legislature's desire to encourage these cases and to provide for attorney's fees, whether it's the relator's lawyers or the state's lawyers. Now, you've indicated earlier in your argument that there's a gatekeeper function here and the attorney general can intervene or dismiss or do a number of things. Yes. At the time that, once the recovery is had, and at the time that a fee bill is being submitted, there's an indication, at least from the defendant's argument, that there may be overcharging, abusive fee generation. Does the attorney general have any power or authority with regard to the legal fees? Our experience has been, if the attorney general wants to speak up, they will do so. It's not in the statute, but if they want to, they do. But beyond that, we had to submit a very detailed fee petition, as in any fee-shifting case, to Judge Mulroy. He went through it and made hour-by-hour corrections. The defendant had a full opportunity to be heard. So not only is there the state's power throughout the whole case to control it, but then there's the final check and balance of the ability of the circuit court to review the fee petition. And, indeed, as the court knows, there's even a provision in the False Claims Act that provides that if a case is brought frivolously, we, the relator, is responsible for the defendant's fees. And no such – that's in a declined case. And in all the cases that the relator has brought, every attempt by a defendant to invoke that provision has been denied. So I believe, Your Honor, that there's an enormous set of controls here by the attorney general, under the statute, controls that were not present in Hammer v. Linz. And I would like to make one additional argument. I talked about how the statutory scheme, the four sections of the act that grant fees, shows the legislature's intent, unlike the Federal Act, to encourage these actions and to award fees for the work of the own lawyers, whether it's the relators or the state. I've dealt with the Hammer v. Linz issues. And I think the other thing is to focus, Your Honor, on the exact language of Section 4D-2, which is the specific section under which we have sought fees and which they were awarded by the circuit court. In that provision, 4D-2 reads that the relator shall also receive an amount for reasonable expenses, which the court finds to have been necessarily incurred, plus reasonable attorney's fees and costs. Now, my pillow repeatedly argues that to recover fees, the relator had to have necessarily incurred fees to a separate law firm. But under the statutory construction principle known as the last antecedent doctrine, from Bowman v. American Transport and other cases decided by this court, the qualifying words necessarily incurred only modify the immediately proceeding term expenses. Similarly, the qualifying word reasonable only modifies attorney's fees and costs. So fees, unlike my pillow's argument, do not have to have been necessarily incurred, only reasonable. That's the only requirement of the statute, and the circuit court found here that the fees were reasonable. And as this court said in Citibank v. Illinois Department of Revenue last year, it's the language of the statute that provides the best indication of the legislature's intent. Thank you. Thank you. Good morning. May it please the court. Kate Batten on behalf of Appellee My Pillow. The thoughtful and well-reasoned opinion of the appellate court should be affirmed for three principal reasons. First, the purpose of the fee-shifting provision in the Illinois False Claims Act would not be served by awarding fees to a relator that is both the client and the attorney. Second, the potential for abusive fee generation is significant if attorney's fees are awarded to a law firm that serves as both the relator and the attorney. Third, relator lacks sufficient independent and objective detachment from its member lawyers to justify eligibility of an award for fees in this case. These are the very same reasons that this court held that the pro se litigant in Hamer was not entitled to attorney's fees, and the very considerations that have been uniformly and repeatedly applied in the Illinois appellate courts, including the first district in this case. Turning to the first reason for affirmance, as the appellate court noted, the purpose of the attorney's fee provision in the Illinois False Claims Act is to remove the burden of legal fees as a deterrent for individuals to bring forth evidence of fraud against the government. The fee provision is not a reward for successful relators. A relator is already compensated under the act by the relator's share of the proceeds in the lawsuit. The share is as high as 30% of the proceeds when it is the relator who conducts the case without the state's intervention, and as low as 15% in cases when the state intervenes and conducts the litigation. The relator's share is determined based on the amount of effort it expends. In this case, it received 30% of the proceeds because the state did not intervene, and the relator conducted the litigation. An award of attorney's fees to the relator on top of the relator's share would, as the appellate court noted, result in a double recovery to relator rather than reimbursement for fees expended on counsel. Relator essentially argues that this brought in significant sums of money for the state, and it would not do so without the promise of a double reward. However, that ignores the thousands of cases brought in federal courts and states by relators represented by outside counsel. Surely, a relator can hire outside counsel to litigate these cases, as it did early on in this case. As the Illinois Chamber of Commerce brief notes, the relator's historic ability to receive a double reward in these cases has created a flood of litigation. This cottage industry created by relator is unique to Illinois, as this type of mass litigation is simply not present in other jurisdictions. And as the attorney general cautions in its brief, this double reward encouraged parasitic or non-meritorious lawsuits. But couldn't the attorney's fees be seen as both a reward and an incentive to ferret out fraud? I don't believe that was the intent of the attorney fee provision. The ferreting out the fraud part is covered by the relator's share. The attorney's fees is meant to reimburse the fees for an attorney acting in that case. It is meant the fee-shipping provision is meant to overcome any type of deterrent that someone who has discovered fraud and to bring it forth, knowing that they would be recovered for their attorney's fees. So if the relator's an attorney and they hire another attorney, they could recover attorney's fees? Absolutely. That happens all the time in the federal context of other jurisdictions and in this state as well. Moreover, as the court held in Hamer and the Illinois courts have uniformly held, a lawyer representing himself does not incur legal fees. In this case, relator did not incur legal fees. Relator is not obligated to pay for the services of its member attorney's win or lose in any cases it is brought under the False Claims Act, including this state. The relator in his opening statement talked about the word necessarily in the statutory argument. The issue is not necessarily. The issue is incurred. The relator did not incur attorney's fees, and that is something that has been considered by the Hamer courts and the appellate courts. The appellate court correctly held that the fee-shipping provision in the Act would not be served by awarding attorney's fees to a relator in this context, where it served as both attorney and relator. Second, the appellate courts held that the significant potential for abusive fee generation was in favor of denying an attorney fee award to this relator. As the appellate court recognized, Mr. Dimon has made a business out of filing these False Claims Acts as a party plaintiff. As the Illinois Chamber of Commerce brief noted, Mr. Dimon has filed over 1,000 Illinois False Claims Act cases. Clearly, the potential for earning fees is a significant driver for the relator in filing the cases and serving as its own counsel. You mentioned that it was kind of unseemly that the relator didn't incur fees because they used their own attorneys, but the Attorney General also gets opportunity for fees, and that's the same office as well. How can you explain that? Well, I think that's a very different check in place when you are talking about the Attorney General's Office of the State of Illinois and its member attorneys. So the relator doesn't step into the shoes of the Attorney General's Office? Absolutely not. And I think the Attorney General's brief is very clear on that. That's not how they view the relator's role. What's happened in these other cases, counsel? Have there been appeals taken in the other cases? You said there's 1,000. There's 1,000 cases, yes. Only one case, this one, has the relator prevailed in litigation. Most of the other cases have settled, as you can see in the BNA article, that the relator attached to his brief. You can see sort of by the statistics in that that they're rather low-dollar cases. While merely a finding that there's a potential for fee abuse is all that's necessary to deny the relator a double recovery, the record in this case actually supports a finding that relator did engage in abusive fee generation. Relator billed over 2,000 hours on this case. He billed nearly three times the attorney's fees, as did the counsel for defendant, in defending this case. Relator also billed, as attorney time, time for acting as both attorney and client. For example, when relator's member lawyer called another one of the member lawyers to testify as a witness at trial, both member lawyers claimed attorney's fees for their time, as did Mr. Diamond, who was present at counsel during the examination. Mr. Diamond also claimed attorney's fees for the time he spent testifying as a witness in this case, even though he was called to the stand as the relator. Mr. Diamond and two other member lawyers also claimed attorney's fees for pre-suit activities, such as the purchase of the MyPillow products and Mr. Diamond's personal credit card. Relator doesn't dispute these examples and effectively concedes them. Relator instead argues that the appellate court held that he did not engage in abusive fee generation, but the appellate court made no such holding. This case provides a prime example of some of the abuses that can and do occur in these False Claims Act cases brought by this relator. It violates the purpose of the act and the public policy of this state to award attorney's fees where the potential for abusive fee generation or actual abusive fee generation occurs. This is another reason why relators should not be allowed a double recovery in this case. Third, and finally, the appellate court correctly held that the relator lacked sufficient independence and objective detachment from its member lawyers to justify a fee reward in this case. As numerous courts have recognized, even a skilled lawyer who represents himself is at a disadvantage. The old adage that a lawyer who represents himself as a fool for a client is conventional wisdom. A lawyer representing himself is deprived of the judgment of an independent third party. Here, Stephen B. Diamond, PC, and Stephen B. Diamond himself are intermingled so as to operate as essentially one in the same. Indeed, Mr. Diamond testified that he's the president of Stephen B. Diamond, PC. He personally made purchases of MyPillow products on his personal credit card. He performed legal work, including conducting the examination of MyPillow's CEO at trial, and he also served as a witness at trial. There clearly is not the requisite independence if the same person is both the final decision maker at the client corporation, its president, and the lead attorney giving advice to the final decision maker. Instead of addressing the concerns of the appellate court and the cited evidence of a lack of judgment between the law firm, the independent judgment between the law firm and Mr. Diamond, the relator argues that this court's decision in Scicchiti, which is essentially a case of outstanding, provides support for its argument that since the attorney general retained complete control over the litigation, therefore it acted to ensure the relator's attorneys effectively prosecuted the action and did not generate excessive or abusive fees. Relator waived any argument in reliance on Scicchiti because it failed to raise these arguments in the circuit or the appellate courts. Nonetheless, the Scicchiti case- Are you merely pointing out that it isn't wise that Mr. Diamond was both relator and attorney? Your argument isn't that he couldn't serve in that capacity, just that he can't get paid for the- That is. That is. I was arguing that it shows that there's a lack of independence there, which is something that was considered by this court in Hamer and is considered by the appellate courts in applying the considerations of Hamer, that there's some type of independence. It's also unwise to proceed without independent counsel. The Scicchiti case doesn't help relator. The issue before the court in Scicchiti was whether the Illinois False Act places sufficient control in the hands of the attorney general over key TAM cases. This court held that the act does not usurp the attorney general's constitutional power to conduct the legal affairs of the state when the state's the real party at interest. The case has no bearing on the question of whether relator has sufficient independence and objective detachment from its member lawyers to satisfy your concerns in the Hamer case. The relator's argument that the state provided to relator independent legal counsel as contemplated by Hamer is without any merit. The brief submitted in this case on behalf of the attorney general completely contradicts relator's assertions. Even though the state has actual control over the litigation, it's the relator that conducts the litigation when the state doesn't intervene. The attorney general's control doesn't entail it to approve or authorize every filing by the relator or otherwise act as independent counsel of the relator. The act does not require the attorney general to review pleadings or discovery requests and certainly doesn't determine if they're in good faith or an exercise in excessive fee generation. The relator does not represent the state in this case such that they can recover fees for its representation of the state. Only the attorney general may represent the state and the holding in Scachitti reinforces that conclusion. In Scachitti, the court reiterated the attorney general has exclusive power to represent the state in litigation where the state is the real party of interest. The relator was allowed to conduct the litigation in place of the state as a partial assignee of the proceeds of the litigation. The relator says that essentially he filed 25 cases. At first, the court, the attorney general intervened and then the attorney general said, you know, go at it. We have a number of relator's attorneys working for us now. There's nothing in the record to suggest that that is what happened at all. And in fact, one other plausible explanation of the attorney general failing to intervene at one given point is that they didn't have the resources to do so and that Mr. Diamond had flooded the courts with false claims act lawsuits. Well, counsel, what about Mr. Diamond's representations that the attorney general was at numerous hearings in this proceeding? That's correct. I mean, the attorney general has a right to receive copies. The attorney general did attend. The trial sat there. Wait a minute. I'm asking the question. Sorry. Go ahead. You made the point that the attorney general may not have had the resources. What I'm trying to sort out here is he said they were present. In fact, at trial, they sent three attorneys. Did they send three attorneys? I don't recall that. There were certainly more than one at the trial. I thought it was two, but I would take his word for it. There were three at the trial. Let me go back to another point. Did you say the fee bill was 2,000 hours? 2,000 hours, yes. Was that the original bill? That was the original bill. And what about Judge Mulroy's review? Was it chopped down? He did take off some hours. How much? As I stand here today, I don't recollect. In my mind, it wasn't a material amount. I had requested to do discovery on the fee petition, and that request was denied. So I would take issue with a thorough review of the fee petition by the trial court judge. Thank you. Now, there's some discussion, too, in the briefs about a footnote in the K decision. And I would submit that the appellate court properly rejected that argument there because the K footnote speaks only to the existence of the attorney-client relationship. And here, the appellate court found that there was an attorney-client relationship, but that wasn't enough under the law as established in Hamer and applied in the appellate courts in various contexts. We really need to look at things that we discussed, whether the fees were actually incurred, the potential for abusive fee generation, and the need for an objective, detached viewpoint of independent counsel. All of these considerations do not favor an award of attorney's fees in this case. The relator also argues extensively about the various provisions, the fee provisions in the Illinois False Claims Act. Not one of them says that a relator may receive an award of attorney's fees when it serves as both the relator and the attorney. And any of the fee provisions relating to the state don't apply to the relator. They don't allow the relator to recover. As I indicated and as the state attorney general has indicated, the relator does not represent the state. The relator also argues that the amendment to the fee provision in 2010 to allow an award of fees for the work of employees of the attorney general means that the relator should be allowed to recover fees for its own work. That argument, I think, is nonsensical. The amendment to the act, I think, really supports our argument. The legislature only amended the statute to allow for fees for the attorney general's employees. The legislature did not add an exception for self-represented relators. If the General Assembly wanted to add such a provision, it surely knows how to do so and could attempt to do so. The legislature, as you see in the Illinois brief on behalf of the Illinois Chamber of Commerce, the legislature is well aware of Mr. Diamond's business and should it have desired to award him a double recovery, it certainly knows how to do that. The appellate court's decision here in the First District prohibits this relator law firm from serving as both relator and attorney in the same case and profiting from both roles. That holding should be affirmed by this court because it's consistent with the purpose of the act and the public policy of the state of Illinois. If you have no further questions, I have no further questions. Is this primarily a public policy question? I think it is primarily a public policy question. I think that this is an issue of first impression. It hasn't been heard in other courts. This issue hasn't come up in the federal context. I think there's nothing in the statute which speaks to whether the relator can recover attorney's fees for representing itself. I think you look at the plain language of the statute, you could argue that they wouldn't even need to put in attorney's fees if they were talking about one and the same person, but I think it's something that it really is a matter of public policy. I would encourage this court to follow its sound reasoning in the Hamer case and looking at the Illinois policy in the state. Thank you. Rebuttal. Your Honor, I do believe this is a case of public policy and as this court has repeatedly said, it's the legislature that first sets public policy. The legislature, for three separate and independent reasons, has established that the state has the control that's necessary here under Scicchiti in terms of the Act and that both the particular 4D2 section language and the attorney's fees scheme set out in the four provisions for fees establishes the legislature's public policy to encourage these actions by providing fees. Fees for the attorney general for the work of its lawyers and a relator for either the work of its lawyers or if it's able to hire another law firm, but in both cases, fees to the relator. Judge Mulroy reduced the fee petition of the relator by $150,000. As I said in my opening, he went through hour by hour and made amendations and that was the result of it. Now, my pillow argues that the state is taking a position the same as my pillow, but in fact, upon reading the state's amicus brief, the state for the first time concedes that it would be appropriate for a self-represented relator to receive fees under the Act. But the caveat the state or the attorney general puts in the amicus brief is, well, there has to be a large enough law firm so that the lawyers who work on the case would be somehow separate from the lawyers who weren't working on the case. In other words, a large law firm could be a self-represented relator entitled to fees, but a small firm like the relator here would not be. But that, besides being kind of a prejudicial decision or suggestion to the court and also unworkable because they say, well, you have to prove that the lawyers who worked on the case were sufficiently independent for other lawyers in the firm, whatever that means. I think it's a lot easier to look at Scicchiti and the statutory framework that Scicchiti upheld, where there's five pages in Scicchiti about how the attorney general retains control and the relator is always completely subordinate. That's where you get the independent control, and it's not just the gatekeeper control that this court was concerned about in Hammer. It's control throughout the entire case. And, in fact, the state has exercised that control. They've offered what they call global settlements in a number of cases, where they decided the cases had merit, taxes were not being paid, and they offered a global settlement formula, and hundreds of defendants chose to accept that formula. There are other cases where the state has exercised its power to dismiss. The relator brought a large number of cases where we found there were internet liquor retailers selling to Illinois. They had no liquor license, no retailer's liquor license. They were collecting no tax. The attorney general decided to dismiss those cases. After authorizing them all to go forward, after about six months, they decided to dismiss them. The appellate courts have held that the attorney general, unless you can prove that the attorney general is acting by fraudulent intent, has that power. That's what Scicchiti said the attorney general could do. That's what the statute does. So the statute here has worked exactly as the legislature intended when they set out their public policy in the act. The attorney general, in its amicus brief, says this. The attorney general has an obligation to consider every action filed by a relator under the act. A ruling that a successful relator law firm is always entitled to attorney's fees for its attorney's work could provide an incentive for law firms to bring low-value or meritless actions in the hope of obtaining attorney fees for resulting potential increase would overburden the attorney general. Is that a factor we should take into consideration if we consider public policy? Well, there are several points that I want to respond to. First of all, the idea that we're going to knowingly file low-value cases. When the relator here files a case, we found that tax was not being collected and we thought it should have been. But it's the attorney general who has access to the records of the Department of Revenue. They investigate it and they determine whether the case should go forward. We don't have access to that information. We bring a case because we think it's a meritorious case. In every case, the attorney general has permitted that case to go forward. So the idea that somehow we're the public policy, the public policy is expressed in the act and it's been enforced and administered exactly as the act provides. Also, when we file a case like this, although the attorney general and the Department of Revenue will know something about tax liability, although in this case my bill was not registered and was making sales from Minnesota, Illinois, so they didn't have the information, it turned out it was more than $4 million that they weren't collecting. But we don't find out until into discovery, usually there's motion practice, what the amount of taxes that's owed is. If it turns out to be a relatively modest amount, we always find the defendants go to the attorney general after they lose their motion to dismiss and say, we'd like to settle this case. And the attorney general time and again has come to us and said, this is what we think is the value of the case, we want it settled. And we agree with it. Just out of curiosity, how do you file these without having the knowledge? Is it a guess? No, we know that we have to do two things, like with Target and Walmart. We have to find that they're making Internet sales and they're not collecting tax. Then we have to make the second determination, is there a basis on which they should be collecting tax? With Target and Walmart, it was based upon the fact that they were using their stores in Illinois, which were separately incorporated. So you don't know the amounts? We don't know the amounts, but we don't file. And similarly, with MyPillow, we knew that they were coming to craft shows in Illinois. During the statutory period, they came here for over 300 days. So we knew they had a physical connection. We knew, therefore, under the use tax, they had a responsibility to collect tax. But, of course, we didn't know the amount. It turned out it was more than several hundred thousand dollars. If normally we would defer to the legislature on policy decisions, does it make a difference that this involves the practice of law and attorneys and our oversight of that profession? That's a good question, Your Honor. I would say, though, Scicchiti dealt with that issue and it applied and looked at the question because it said, Scicchiti specifically said the state's interests, not the state, but the state's interests are being represented by other lawyers. And Scicchiti said, under the statute, the case is brought by the relator on behalf of the state and the relator. But that's what the legislature wanted. Certainly there is the rules of professional conduct that we're always bound by, and I think that there would be no separate reason here, because this is primarily a tax issue and a litigation issue, that there should be a greater role for the court than Scicchiti recognized was appropriate under the False Claims Act. So for those reasons, Your Honor, the fact that the fees language is the same, whether it's for the state or the relator, the specific fees provision here allows fees, and that the False Claims Act language as interpreted in Scicchiti answers the hammer FOIA concerns where there was no textual answers. For those reasons, Your Honor, relator asks that the decision of the appellate court be reversed. Thank you very much. Thank you. Case number 122487, people, X. Rochette et al. versus MyPillow will be taken under advisement as agenda number 14. Mr. Diamond, Ms. Batten, we thank you for your arguments this morning. You're excused for their thanks.